UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DANIKA D. WILLIAMS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:21-cv-00959-JMS-KMB ) |
| WEXFORD OF INDIANA, LLC, JOHN MERSHON DR., | ) ) ) ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Danika Williams previously was incarcerated at Indiana Women's Prison (IWP). She alleges in this civil rights action that after she suffered a second-degree burn while working in the prison kitchen, Defendants Wexford of Indiana, LLC and Dr. John Mershon were deliberately indifferent to her medical care. Defendants have filed a motion for summary judgment. For the reasons below, that motion is **granted**.

**I. STANDARD OF REVIEW**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

1

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II. F<small>ACTUAL</small> B<small>ACKGROUND</small>

The facts as viewed in a light most favorable to Williams as summary judgment nonmovant follow. Dr. Mershon, whose specialty is gynecology, worked for Wexford as the Medical Director at IWP. On November 2, 2018, Williams sustained second-degree burns on her right arm while working in the kitchen at IWP. Dkt. 106-1, pp. 60, 62. She was seen by two nurses in the infirmary immediately thereafter. Pursuant to Dr. Mershon's instructions, the nurses applied a topical medication, Silvadene, to the wound; the wound was dressed; and Williams was prescribed Keflex, an antibiotic. *Id.* She also initially was given Tylenol-3 for pain. Dkt. 106-4, p. 23.

2

Dr. Mershon first personally examined Williams on November 5, 2018, three days after the incident. He observed that she had blistered lesions on her arm but they appeared clean and dry. Dkt. 106-2, p. 2. He ordered continued frequent dressing changes with the Silvadene application and continued the Keflex prescription. *Id.* Dr. Mershon again examined Williams on November 13, 2018, and believed her arm was healing well and ordered continued frequent dressing changes. *Id.*

On December 7, 2018, Dr. Mershon saw Williams after she submitted a healthcare request complaining of pain and bleeding. Dr. Mershon observed some superficial bleeding but no indication of pus. He gave her Bactrim for possible infection and Naproxen for pain relief. *Id.* at pp. 2-3. Dr. Mershon next saw Williams on December 18, 2018, at which time he thought the wound was healing well but saw some open areas, so he ordered continued use of Bactrim and frequent dressing changes. He also ordered that Williams not work for 14 days. *Id.* at 3.

At a January 3, 2019, appointment, Dr. Mershon thought the arm appeared "near fully healed" but not entirely. *Id.* He ordered that she could return to work and that future dressing changes be "dry", e.g., without Silvadene. *Id.* On January 22, 2019, Williams was seen for a "recent setback as several spots had broken open again." *Id.* Dr. Mershon ordered continued use of Bactrim and of a lotion after 2-3 days. *Id.* On February 7, 2019, Williams reported to Dr. Mershon that she had bumped her arm on her bunk, which caused a spot on her arm to open. Dr. Mershon still thought the wound was healing appropriately but did notice the skin was very thin, so he ordered that she start applying aloe vera cream on the arm and also put in an order for a different topical cream, minerin, for her to use. *Id.* at 4.

In April 2019, Dr. Mershon submitted an outpatient request for Williams to receive additional care because the wound was still not fully healed. *Id.* This resulted in consultation with

a company based in Tennessee, MyWoundDoctor, that provides remote clinical advice for patients with troublesome wounds. *Id.*; Dkt. 106-3, p. 4. MyWoundDoctor is led by Dr. Nicholas Sieveking, a board-certified reconstructive surgeon. Dkt. 106-3, p. 4. Dr. Sieveking or others will review medical records and photographs of wounds sent from other doctors and make treatment recommendations. *Id.* As testified to by Dr. Michael Mitcheff, formerly Wexford's medical director, Wexford contracted with MyWoundDoctor because it believed it provided better results overall for wound care than always sending inmates off-site to local hospitals for referrals. *Id.* Dr. Mershon consulted with MyWoundDoctor over the next few months in treating Williams's burn and followed their recommendations. Dkt. 106-2, p. 4-5.

MyWoundDoctor also will send wound care kits to patients if warranted; the kits include bandages, a scrubber, soap, lotion, and gloves. *Id.*; Dkt. 106-4, p. 10. Williams received two such kits during her incarceration, which she was allowed to keep in her cell and which she used every day. Dkt. 106-4, p. 10. Also, Williams was provided with arm sleeves to wear over her wound to help prevent accidentally re-opening it. Dkt. 106-2, p. 8.

On May 28, 2019, Dr. Mershon noted that Williams's wound had become infected and prescribed antibiotics. *Id.* at p. 4. Williams also complained at this visit that the summer heat exacerbated the pain from the wound, so Dr. Mershon said he would request that Williams be housed in an air-conditioned dorm to help alleviate her discomfort. *Id.* at pp. 4-5.

On August 13, 2019, Williams's mother called 911 and reported that Williams was having an emergency. *Id.* at p. 5. An ambulance was sent to IWP but was turned away. *Id.* Dr. Mershon saw Williams in the infirmary and did not note any infection or bleeding from the wound, but he did prescribe an antibiotic and agreed to refer Williams for an outside consult. *Id.*

4

On August 22, 2019, Williams was seen by Dr. Carl Manstein, a plastic surgeon at Terre Haute Regional Hospital. Dkt. 115, p. 1. Dr. Manstein noted that the wound was "painful and unstable," and he recommended that Williams undergo a tissue expander procedure. *Id.* The procedure would require three to four operations in total and biweekly trips to the hospital for three months. *Id.* at p. 16. He also recommended frequent application of Aquaphor to the wound, which Williams did receive. *Id.*; Dkt. 106-2, p. 6.

Although Williams wanted the surgery, Wexford and Dr. Mershon did not approve it. Instead, Dr. Mershon sought a second opinion from MyWoundDoctor. Dkt. 106-2, p. 5-6. After reviewing Dr. Manstein's notes and photographs of Williams's arm, Dr. Sieveking responded:

> I categorically disagree. Do not use tissue expanders and multiple reconstructive procedures. This skin is healed and there are no open wounds....success!!! The pain may be real, but there is likely to be more long-term pain with tissue expansion and serial reconstructive efforts. Please do not operate on this arm.

Dkt. 106-1, p. 20.

In August 2019, Dr. Mershon also ordered Williams's continued placement in an air-conditioned dorm. Williams also continued to receive topical creams, arm sleeves, pain medication, and regular medical visits. Dkt. 106-2, p. 6. In February 2021, in response to complaints that cold weather aggravated Williams's pain, Dr. Mershon ordered that she not work outside for 6 months. *Id.* at 7. The last medical visit noted in IWP records is from March 2021, when Dr. Mershon believed the wound was stable and advised Williams to continue using the Aquaphor cream. *Id.*

Williams was moved to Madison Correctional Facility in September-October 2021 and released from incarceration in January 2022. Dkt. 106-4, p. 4. Williams has not received any additional medical treatment for her arm since her release, due to cost and lack of adequate

insurance coverage. *Id.* at 15. At the time of her deposition taken in May 2022, Williams was working a 10-hour, 5-days a week shift at a factory. *Id.* at 23-24. She also did not have any open wounds at that time. *Id.*

The Court acknowledges that although Dr. Mershon's affidavit and the IWP medical records frequently refer to Williams reporting progress in the healing of her wound, or that she was not experiencing pain, she denies making such statements. Dkt. 115, p. 1. For summary judgment purposes, the Court accepts that Dr. Mershon and the medical records may have mischaracterized Williams's statements during her medical visits at IWP.

### III. DISCUSSION

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

There is no dispute that Williams's second-degree burn constituted a serious medical need. Thus, for Defendants to be entitled to summary judgment, they must show as a matter of law that they did not act with deliberate indifference—that is, that they did not consciously disregard a serious risk to Williams's health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Williams "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id.* "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). "[A] jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Id.* at 241−42.

No reasonable jury could find that Dr. Mershon was deliberately indifferent to Williams's condition. He (or nurses acting under his instructions) provided her with frequent care that included painkillers and antibiotics as needed, topical ointments and creams, wraps, and arm sleeves to protect the wound from accidental aggravation. Dr. Mershon also ordered that Williams be housed in an air-conditioned dorm when it was hot, and to not work outside when it was cold, to reduce pain and aggravation to the wound. When the arm did not appear to be healing perfectly, Dr. Mershon consulted MyWoundDoctor and Dr. Sieveking for treatment advice and acted accordingly. Although Williams suggests that Dr. Sieveking could not possibly have provided adequate expert advice on the basis of medical records and photographs alone, she has not designated any evidence in support of such a claim. That is, Williams has not directed the Court to any statement by a medical expert suggesting that remote consultation for wound care such as MyWoundDoctor and Dr. Sieveking provided is any way an unreasonable medical practice

generally, or that Dr. Sieveking specifically provided patently unreasonable advice related to Williams's care.

Williams suggests that Dr. Mershon, a gynecologist, improperly refused to take instructions from a specialist, plastic surgeon Dr. Manstein, when he did not try to seek approval for her to undergo surgery by Dr. Manstein as she wanted. *See Petties*, 836 F.3d at 729 (stating that a generalist's refusal to follow advice of a specialist may be evidence of deliberate indifference). But Dr. Mershon did not simply ignore Dr. Manstein's advice; instead, he sought a second opinion from another specialist, Dr. Sieveking, who emphatically disagreed with Dr. Manstein's recommendation. As the Seventh Circuit has made clear, "'an inmate is not entitled to demand specific care,' and medical professionals may choose from 'a range of acceptable courses based on prevailing standards in the field.'" *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (quoting *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011), and *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)).

Moreover, although a disagreement between professionals as to "which of many professionally acceptable treatment plans should have been implemented" might be enough to sustain an ordinary negligence claim, it is not enough to support a constitutional claim. *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 990 (7th Cir. 1998). Courts must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (cleaned up). Perhaps if this were a medical malpractice action, the differences of opinion between Drs. Manstein and Sieveking would create a genuine issue of material fact as to the care Williams received. But this is not such a case. Rather, the existence of that difference shows as a matter of law that Dr. Mershon did not act with deliberate indifference in treating Williams, where there is

no evidence in the record that following Dr. Sieveking's advice fell below a minimal level of medical competence. And aside from refusing to push for Wexford to approve Williams undergoing the surgery, Williams presents no evidence at all of what other treatments Dr. Mershon could or should have provided to her, despite her repeated statements that she did not think the wound was healing. Dr. Mershon is entitled to summary judgment.

Given Dr. Mershon's actions and a lack of evidence that they constituted deliberate indifference, Wexford also is entitled to summary judgment. Wexford is treated as a municipality for § 1983 purposes. To survive summary judgment on an Eighth Amendment claim against Wexford, then, Williams must point to evidence that she was deprived of a constitutional right and that some Wexford action—usually a policy, practice, or action by someone with final decisionmaking authority—caused her injury. *Dean*, 18 F.4th at 235.

To the extent Williams suggests Wexford implemented an improper policy or practice of using MyWoundDoctor to consult on cases such as Williams's, rather than always sending such patients for an outside consult, the Court again emphasizes a lack of evidence that this policy or practice was medically unacceptable. It is true that basing prisoner medical treatment decisions based solely upon what is "cheaper and easier," without regard to whether such treatment is medically sound, can be evidence of deliberate indifference. *Id.* at 242. And there is evidence from which it can be inferred that relying on MyWoundDoctor did result in cost savings to Wexford. But that alone does not show deliberate indifference. Rather, as a general matter, Dr. Mitcheff testified in his deposition that with MyWoundDoctor and the nature of their treatment recommendations, "we just got better results, the wounds would heal." Dkt. 106-3, p. 4. Williams submitted no evidence to contradict this statement. And specifically as to Williams, Dr. Sieveking's opinion was that she would be worse off in the long term if she underwent Dr. Manstein's

recommended surgery or surgeries. In other words, even if MyWoundDoctor and Dr. Sieveking's advice tended to be less expensive and more "conservative," there is a lack of evidence that Wexford's reliance on them as a matter of practice and policy constituted deliberate indifference.

### IV. CONCLUSION

The Defendants' motion for summary judgment, dkt. [104], is **granted**. Williams's action originally included as defendants not only Wexford and Dr. Mershon, but also Dr. Sieveking and prison officials Nikki Tafoya and Laurie Johnson. Dr. Sieveking, Tafoya, and Johnson all have been dismissed from this action. Dkts. 117, 125. Thus, this Order resolves all claims against all defendants. Final judgment accordingly shall issue.

**IT IS SO ORDERED.**

Date: 1/30/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

DANIKA D. WILLIAMS
241912
MADISON CORRECTIONAL FACILITY
Inmate Mail/Parcels
800 MSH BUS STOP DRIVE
MADION, IN 47250